**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JERZY KUCHARSKI and MARIA ROSZEK-KUCHARSKI, | ) ) | |
| | ) | Case No. 14-cv-05574 |
| Plaintiffs, | ) | |
| | ) | Hon. Amy J. St. Eve |
| v. | ) | |
| | ) | |
| ORBIS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Orbis Corporation ("Orbis") has moved for summary judgment on Counts I and II of Plaintiffs Jerzy and Maria Kucharski's Complaint alleging negligence and loss of consortium. (R. 95, Mem. of Law in Support of Mot. for Summ. J.) Defendant has also moved to exclude portions of the opinions and testimony of Plaintiffs' expert Donald Hess pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). For the following reasons, the Court grants in part and denies in part Defendant's *Daubert* motion and grants Orbis's motion for summary judgment.

## BACKGROUND

This case arises from injuries Jerzy Kucharski ("Kucharski"), a truck driver employed by Polmax Trucking, Inc. ("Polmax"), suffered on October 15, 2012, while opening the rear doors of a semi-trailer in Laredo, Texas. (R. 100, Ex. 1, Kucharski's Statement of Facts, 1, ¶¶ 1-2.) Kucharski has sued Orbis for negligence, and his wife, Maria, has sued Orbis for negligence and loss of consortium.

# I.  The Loading of the Trailer

Orbis loaded the semi-trailer with plastic interlocking pallets at its facility in Menasha, Wisconsin and contracted with Polmax to transport the pallets from Menasha to Hidalgo, Mexico—the semi-trailer's ultimate destination as relevant to this lawsuit.  (*Id*. 1-2, ¶¶ 2-3.)  On or about October 10, 2012, Polmax dispatched its local driver, Adam Gadek ("Gadek"), to pick up the trailer and deliver it to the Polmax terminal in Markham, Illinois.  (*Id*. 2, ¶ 4.)  Gadek, who had been driving commercial vehicles for about thirty years and had worked for Polmax for two years, has no recollection of the load at issue, but he signed a bill of lading for the subject load indicating that he picked up the load on October 10, 2012.  (*Id*. 2, ¶ 5-6.)  Oscar Lopez, an Orbis employee, also initialed the bill of lading for the subject load on October 10.  (*Id*. 3, ¶ 10.)  As part of his employment with Polmax, Gadek received and familiarized himself with the Federal Motor Carrier Safety Regulations ("FMCSR").  (*Id*. 2, ¶ 5-6.)  Polmax drivers are required to use load locks, security bars, or other securement measures, including plastic wrapping, to prevent the loads from shifting during transport.  (*Id*. 2, ¶¶ 8-9.)

Based upon the bill of lading and the size of the trailer, there were approximately thirty inches between the end of the load and the rear doors of the trailer.  (*Id*. 3, ¶ 11.)  The load at issue in this case was a sealed load of black plastic pallets that were 48 x 48 inches and weighed 30-40 pounds.  (*Id*. 6, ¶ 4.)  There were 44 cubes, each containing 14 pallets, and they were loaded in 22 stacks of 28 pallets.  (*Id*.)  Each stack consisted of 2 cubes with one cube of 14 pallets on top of another.  (*Id*.)  There was plastic-like banding around the stacks of pallets.  (*Id*.)  The trailer was 53 feet long, leaving 30 inches between the load of pallets and the rear door.  (*Id*.)

Orbis typically loads the trailers and does not allow drivers on the loading dock during the fork-lift loading of the trailers, however, drivers are permitted to stand near the shipping desk, which is about fifty feet away from the loading dock, and watch their trailers being loaded. (Kucharski's Statement of Facts 3, ¶ 12; R. 95, Ex. F, Dep. of Thomas Young 20: 17-25, 46: 5-22.) Loads must be secured because a load can shift while in transit and securement devices can prevent a load from falling out of the rear doors when the driver opens them. (Kucharski's Statement of Facts 7, ¶ 7.) The loading procedures, contained in the "Order Picking and Shipping" document, indicate that the loader is responsible for ensuring that the load is secured within the trailer. (*Id*. 6, ¶ 6.) Witnesses, however, offered inconsistent testimony about who has ultimate responsibility for securing the load. Lopez testified, for example, that it is not the loader's job to secure the load with securement devices. (R. 95, Ex. B, Dep. of Oscar Lopez 18: 6-12.) Despite saying that it was not the loader's job, Lopez explained that when the loading docks are busy, Lopez will put the securement straps or locks in place himself to speed up the loading process. (*Id*. 18: 16-24.) Lopez estimated that he did this once or twice a week. (*Id*. 19: 2.) Gadek testified that the shipper is responsible for loading the truck and securing the load with straps, but he also testified that the driver is "supposed to secure the freight" so it does not fall inside the truck. (R. 95, Ex. C, Dep. of Adam Gadek, 40: 18-20; 32: 16-18.) Gadek stated that he always kept a few straps inside the trailer so he could provide them to the shipper to secure the freight. (*Id*. 30: 17-21.)

Lopez also testified that interlocked loads, such as the load in this case, are very secure and even if one of the legs jump out of the securement device, the load itself would still be secure. (*Id*. 36: 3-16.) Shrink wrap can also be used, at the discretion of the loader, to bind the two cubes of pallets closest to the rear door together and prevent them from moving while a

truck was in transit.  (Dep. of Thomas Young, 29: 17-19; 30: 5-7.)  If the loader decided to shrink wrap the load, the loader would use the shrink wrap machine, which was located near the loading dock, to wrap the load in industrial grade Saran wrap during the loading process.  (Kucharski's Statement of Facts, 8, ¶ 10.)  If a load was wrapped, the loader would place a W on the bill of lading indicating as such.  (*Id*.)  The bill of lading for the load at issue in this case did not contain a W, indicating that the load was not shrink wrapped.  (*Id*.)

Thomas Young, an Orbis employee, explained that loaders used either bands or shrink wrap to secure the loads, and that decision was a "personal preference"—each method had "about the same effect."  (*Id*. 58: 1-7.)  Young did state, however, that using shrink wrap was the safest method of securing the last two cubes of pallets when there was space at the back of the trailer between the pallets and the rear doors.  (*Id*. 34: 15-20; 38: 1-3.)  He testified that if there was any space between the load and the rear of the trailer, the best practice was to secure the load with shrink wrap.  (*Id*. 35: 10-12.)  If the trailer was full and the load went completely up to the rear door, however, shrink wrap was not necessary because there was no space for load movement in the trailer.  (*Id*. 34: 21-25; 35: 1-3.)

Once the loading is complete and the forklift is no longer in use, drivers are permitted to approach the rear of the trailer and affix securement devices such as load locks, straps, or bars.  (Dep. of Thomas Young 46-47.)  Drivers, however, sometimes do not go to the dock area to check the back of the trailer after the load is complete.  (Dep. of Oscar Lopez 17: 19-24.)  Oscar Lopez estimated that approximately 50% of drivers go to the rear of the trailers to check the loads after they have been loaded.  (*Id*.)  After the trailer is loaded, the driver receives a green light, indicating that it is safe to pull away from the loading dock and close the rear trailer doors.  (Kucharski's Statement of Facts, 3, ¶¶ 15-16.)  The doors cannot be closed while the trailer is

positioned at the loading dock. (*Id*. 3, ¶ 16.) After the driver pulls away from the dock, drivers typically walk around to the back of the vehicle and close the rear doors and then the shipper seals the doors shut. (*Id*. 9, ¶ 14.) When closing the doors, drivers are able to view the load from the ground level. (R. 95, Ex. C, Dep. of Adam Gadek 42: 3.)

## II.     The Accident

Kucharski picked up the sealed trailer at the Polmax terminal in Markham and proceeded to drive for two days, arriving in Laredo, Texas on October 15, 2012. (Kucharski's Statement of Facts, 4, ¶¶ 19-20.) Kucharski did not open the sealed rear doors until arriving in Laredo. (*Id*. 4, ¶ 21.) When he arrived in Laredo, Kucharski first opened the right rear door of the truck. (*Id*. 5, ¶ 1.) Kucharski testified that when he opened the right rear door, he noticed that the pallets were banded together by metal bands, but he did not notice any additional securement devices. (R. 95, Ex. E, Dep. of Jerzy Kucharski 66: 6-20.) Although it was dark inside the trailer, Kucharski saw the pallets and "everything looked okay" to him. (*Id*. 63: 4-15.) Kucharski then opened the left side rear door, by pulling down on the latch with substantial force. (*Id*. 76: 10-16.) Once Kucharski started to open the door, the door immediately started to open and push him back. (*Id*. 72: 2-10.) He tried to hold the door in place, but quickly lost control of the door. (*Id*. 72: 8-14.) Kucharski testified that after losing control of the door, the door burst open, and five or six of the pallets fell on him. (*Id*. 68: 18-22; 69: 6-8.) Kucharski believes that the pallets must have tipped over while in the back of the trailer. (*Id*. 62: 19-22.) He recalled a band that may have been holding the pallets together dangling close to his body after he fell and he believes that the pallets were not banded together when he opened the door. (*Id*. 70: 11-15, 22-24.)

# DAUBERT MOTION

## I.       Legal Standard

"Federal Rule of Evidence 702 and *Daubert* . . . govern the admission of expert testimony in federal courts." *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable."). Although the Seventh Circuit reviews "the district court's application of *Daubert* [ ] de novo," if "the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion." *Estate of Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016).

Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596). *Daubert* lists a number of relevant considerations in evaluating an expert's reasoning and methodology, including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert*, 509 U.S. at 593–94. A district court's inquiry under *Daubert*, however, is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999); *Hartman,* 758 F.3d at 818. "*Daubert's* list of specific factors neither necessarily nor

exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141 (internal quotation

omitted). "[T]he key to the gate is not the ultimate correctness of the expert's conclusions,"

rather, "it is the soundness and care with which the expert arrived at her opinion[.]" *Wood*, 807

F.3d at 834 (quotations and citations omitted). In short, "[i]t is critical under Rule 702 that there

be a link between the facts or data the expert has worked with and the conclusion the expert's

testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003).

"The party offering the expert testimony bears the burden of proving its reliability." *Brown v.

Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014).

## II.    Analysis

Plaintiffs disclosed Donald Hess as an expert on the standards governing truck drivers.

Hess was a truck driver off and on between 1971 and 1989, and he then became a classroom

instructor regarding truck driving. For over a decade he was the director of transportation and

public safety programs at John Wood Community College in Quincy, Illinois. Hess has served

as an expert witness in over 100 cases in federal and state court. Defendant moves to exclude

three specific categories of opinions offered by Hess: (1) that Orbis violated custom and practice

in the shipping industry; (2) that Orbis's internal policies imposed a duty on Orbis owed to

Kucharski; and (3) that the FMCSR apply to Orbis and create a duty even though Orbis is a

shipper and the FMCSR apply only to carriers.

Before analyzing each opinion, the Court notes, as another court in this district has

observed, that "[g]enerally speaking, the fact that Hess has more than 40 years of experience in

truck driving, both as a driver and as an instructor, is sufficient to qualify him to testify as an

expert in this field." *Ashley v. Schneider Nat'l Carriers, Inc.*, No. 12-CV-8309, 2016 WL

3125056, at *7 (N.D. Ill. June 3, 2016); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 718

(7th Cir. 2000) (noting that "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."). Even a "supremely qualified expert," however, "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Smith*, 215 F.3d at 718 (quotations omitted). Accordingly, while Hess may be generally qualified to offer expert opinions on the trucking industry, to ensure that Hess's opinions in this case are reliable, the Court must examine his methodologies to ensure that his opinions are reasoned and founded on data. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010) (an expert must "explain the methodologies and principles that support his opinion; he cannot simply assert a bottom line").

### A. Opinion Regarding Shipping Industry Custom and Practice

Defendant seeks to exclude Hess's opinions regarding shipping industry customs and practices because, although Hess has experience as a truck driver, he does not have any direct experience in the shipping industry specifically and his opinions are not based on any reliable methodology. Defendant notes that Hess has not inspected the actual pallets or truck at issue in this case and contends that Hess's experience does not provide him with a sufficient basis to offer an opinion as to whether this specific load should have been secured with shrink wrap.

Despite Defendant's arguments, courts typically allow expert testimony regarding the customs, standards, and practices in a given industry. *See, e.g.*, *WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.,* 25 F.3d 422, 429 (7th Cir. 1994) (affirming admission of expert testimony on customs in the real estate industry); *Walker v. Jax Mold & Mach. Ltd.*, 72 F.3d 131 (6th Cir. 1995) ("Due to their extensive practical experience in the relevant industry, the district court did not err in finding that [the experts] were qualified to provide information on industry standards, nor did the court abuse its discretion in determining that their expert opinions would assist the

jury.") *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 803–04 (N.D. Ill. 2013) ("experts may rely on their professional experience to offer opinion testimony regarding the standard of care and generally-accepted industry standards"); *Fed. Ins. Co. v. Arthur Andersen, LLP,* No. 03 C 1174, 2006 WL 6555232, at \*3 (N.D. Ill. Jan. 18, 2006) ("Evidence relating to the [] industry's custom and practice . . . is squarely relevant to whether [defendant] breached its duty [], and expert testimony on this topic will help the jury in determining whether [defendant] breached that duty").

Indeed, several courts have allowed expert testimony, similar to that offered by Hess, on the standards and practices in the trucking industry specifically. In *L.S. v. Scarano*, No. 2:10-CV-51, 2011 WL 4948099, at \*3–4 (S.D. Ohio Oct. 18, 2011), for example, the court analyzed a *Daubert* challenge to Christina Kelly, a certified truck driving and safety instructor who drove 700,000 miles in her seven-year career as a truck driver. The court admitted Kelly's testimony regarding the customs and practice in the trucking industry because Kelly's opinions were reliable, based upon sufficient personal knowledge and experience, and would assist the jury in understanding the evidence. *See also*, *Brown v. Cooper*, No. 11-CV-93-F, 2012 WL 8897779, at \*4 (D. Wyo. Nov. 8, 2012) (admitting expert testimony "concerning standards and practices in the commercial truck driving industry"); *Gruenbaum v. Werner Enter.*, No. 2:09–cv–1041, 2011 WL 445508 (S.D. Ohio Feb. 2, 2011) (rejecting *Daubert* challenge to trucking industry expert).

Here, while Hess has not worked as a shipper, the Court finds that his substantial experience and expertise in the trucking industry provide him with a sufficient basis to opine on the customs and practice for securely loading freight in the shipping industry. Hess has been a consultant in the industry since 1997, he was the director of a transportation and safety program at John Wood Community College, and he has written standards and authored textbooks relating

to truck driving. In addition to his work and driving experience as an instructor, Hess drove about 1.5 million miles as a trucker over a 15-year career with multiple trucking companies. In his deposition, Hess explained that his opinions regarding customs and practices in the industry are based on visiting "hundreds and thousands of docks" during his nearly forty years as a truck driver and trucking instructor. (R. 95, Ex. H, Dep. of Donald Hess 100: 12-23.) Although Hess has not specifically worked for a shipping company, his extensive experience at shipping facilities—observing the loading and securement of freight and ensuring that freight in his trucks was secure—provides him with a sufficient basis to opine as to the customs and practice for securing loads in the trucking industry.

Further, with respect to Defendant's objection that Hess's particular experience is not relevant because he did not work in the shipping industry specifically, Defendant may cross-examine Hess regarding the particular circumstances of his experience and present contrary evidence as it sees fit. Courts will not exclude experts regarding industry standards generally at issue in a case merely because they do not have expertise in a sub-specialty. *See J&R Well Serv., LLC v. Horizontal Rentals, Inc.*, No. 11-CV-206-F, 2011 WL 13112086, at *2 (D. Wyo. Nov. 3, 2011) (refusing to exclude trucking expert because the trucking services he provided were of a different nature than those at issue in the case); *Durkin v. Wabash Nat.*, No. CIV.A. 10-2013, 2013 WL 1314744, at *10 (D.N.J. Mar. 28, 2013) (admitting trucking expert even though he did not drive the type of trucks at issue because his "general experience in the trucking industry, particularly with safety standards and driving, qualify him to testify as an expert in this case"). As the Supreme Court has noted "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 209 U.S. at 596.

Here, like the expert in *Scarano*, Hess's experience-based opinions are reliable and will assist the trier of fact in understanding the customary and reasonable methods for securing freight in the trucking industry and evaluating whether Defendant satisfied its duties in this case. 2011 WL 4948099, at *4; *see also Lippe v. Bairnco Corp.,* No. 96 CIV. 7600, 2002 WL 15630, *2 (S.D.N.Y. Jan. 7, 2002) ("An expert may properly testify as to the customs and standards of an industry, and [ ] opine as to how a party's conduct measured up against such standards.") (quotations and citations omitted).  Accordingly, the Court denies Orbis's motion to bar Hess's opinions regarding the customs and practices for securing freight in the trucking industry and whether Defendants' conduct complied with those standards.

## B.  Opinion Regarding Duty Imposed by Orbis's Internal Policies

Defendant next seeks to exclude Hess's opinions regarding Orbis's internal policies because those internal policies do not impose a legal duty on Orbis.  Plaintiffs respond that Hess "does not seek to impose a duty by internal procedures," but still argues that Hess should be allowed to offer opinions about Orbis's internal policies because his opinion that Orbis violated its own policies is relevant to this matter.

Another court in this district recently addressed this precise issue in relation to this specific expert.  In *Ashley v. Schneider Nat'l Carriers, Inc.*, No. 12-CV-8309, 2016 WL 3125056, at *12 (N.D. Ill. June 3, 2016), the plaintiff offered Hess as an expert witness, and the court analyzed a *Daubert* challenge to Hess's testimony that the truck driver defendant had violated his company's internal policies by parking his truck on the side of the highway.  The court explained that Hess "has decades of experience in instructing truck drivers on highway safety protocols" and found that it was within his "expertise to review a trucking company's [policies] and to opine whether [defendant] ran afoul of the company's standards."  *Id.*  The court

reasoned that Hess had a suitable basis for forming his opinions because he reviewed the relevant policies and the depositions describing the facts in the case. *Id.* The court thus found that Hess's testimony would aid the trier of fact and accordingly, denied the defendant's *Daubert* objection. *Id.*

The court's reasoning in *Ashley* is applicable here. As the court explained in *Ashley*, Hess has decades of experience in the trucking industry and extensive knowledge of procedures and policies in the trucking industry. Indeed, Hess helped to develop the standards and testing requirements used to certify truck drivers in Illinois. It is within his expertise to review Orbis's policies and opine as to whether Defendant's employees followed those policies in this case. Given Hess's experience and expertise, his opinions regarding Orbis's compliance with its policies are sufficiently reliable and will aid the jury in understanding the issues in this case. To the extent Defendant believes that Hess has misinterpreted Orbis's policies or misapplied them to the facts of this case, Defendant may address such issues on their cross-examination or by examining other witnesses familiar with Orbis's policies.

Accordingly, while the Court bars any opinions about the legal duty imposed on Orbis by its internal policies, the Court denies Orbis's motion to bar Hess's opinions regarding Orbis's internal policies and whether Orbis violated those policies in this case.

### C. Opinion Regarding FMCSR Applicability to Orbis

Finally, Defendant seeks to exclude Hess's opinions regarding the application of the FMCSR to Orbis's conduct because these opinions would constitute inadmissible legal conclusions. Plaintiffs do not dispute that the FMCSR imposes a duty on carriers, but argue that Hess should be allowed to opine as to whether the FMCSR applies to the facts in this case.

It is well established in the Seventh Circuit that expert witnesses are not permitted to give testimony "as to legal conclusions that will determine the outcome of the case." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). In *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994), for example, the Seventh Circuit held that the district court erred in allowing expert witnesses to testify regarding the meaning of the Federal Motor Vehicle Safety Standards and whether the defendant complied with those standards. The court held that "[t]he meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." *Id.* In line with the reasoning in *Bammerlin*, courts have excluded testimony from trucking industry experts, including this particular expert, regarding the applicability of federal regulations or laws. In *Ashley*, for example, the court did not permit Hess to testify about whether the defendant truck driver violated the Illinois Vehicle Code or the Illinois Highway Regulations because such testimony would constitute impermissible legal conclusions and because it "is the duty of the [c]ourt, not experts, to determine the meaning of statutes and regulations." *Ashley*, 2016 WL 3125056, at *12.

Other courts have applied the same reasoning to exclude testimony from trucking industry experts regarding the applicability of the FMCSR to a particular set of facts. *See, e.g.*, *Trinidad v. Moore*, No. 2:15-CV-323-WHA, 2017 WL 490350, at *3 (M.D. Ala. Feb. 6, 2017) (excluding expert opinions regarding requirements of FMCSR and whether defendant's conduct complied with the FMCSR because "[e]xpert witnesses may not testify that a party violated a federal regulation"); *Nicholson v. McCabe,* No. 02–1107, 2003 WL 25676476, at *1 n. 2 (N.D. Ala. July 18, 2003) (precluding expert testimony that defendant violated the FMCSR but finding the FMCSR itself admissible as safety standards relevant to the standard of care in the industry);

*Malburg v. Grate*, No. 11-14856, 2014 WL 4473786, at \*3–5 (E.D. Mich. Sept. 9, 2014) (finding

that party may introduce FMSCR through expert, but expert "may not offer his interpretation of

these regulations or expound on what they may require beyond what they state on their face").

Here, the parties dispute whether the FMCSR applies to Orbis and whether Orbis

employees violated those regulations. These are questions for the Court and the jury to resolve,

not an expert. While the FMCSR itself is admissible, in line with the cases discussed above,

Hess may not offer any opinions about the applicability of the FMCSR to Orbis or about Orbis's

compliance with the FMCSR because those opinions would constitute impermissible legal

conclusions that are reserved for the court and the jury. As the court stated in *Ashley*, "it is the

duty of the [c]ourt, not experts, to determine the meaning of statutes and regulations." 2016 WL

3125056, at \*12. Accordingly, the Court grants Orbis's motion to exclude Hess's testimony

about the meaning and applicability of the FMCSR.

## SUMMARAY JUDGMENT

### I.     Legal Standards

#### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate when the record, viewed in the light most favorable to

the non-moving party, reveals that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Smith v. Hope*

*School*, 560 F.3d 694, 699 (7th Cir. 2009). A genuine issue of material fact exists when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216

F.3d 596, 599 (7th Cir. 2000) ("The existence of a mere scintilla of evidence supporting a

plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find

for the plaintiff.").  In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party.  *Anderson*, 477 U.S. at 255.

The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law.  *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010).  If the moving party demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute."  *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).  The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial."  *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).  A genuine issue of material fact exists only if there is evidence sufficient "to permit a jury to return a verdict for" the non-moving party.  *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010).

### B.  Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 governs how the parties identify material facts and potential disputed material facts.  "The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination.  It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact."  *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015).  Local Rule 56.1(a) "requires the party moving for summary judgment to file and serve a 'statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'"  *Id.* at 218 (citation omitted).  "The non-moving party must file a

response to the moving party's statement, and, in the case of any disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Petty v. Chicago,* 754 F.3d 415, 420 (7th Cir. 2014) (citation omitted); *see also* L.R. 56.1(b)(3)(A). Local Rule 56.1(b)(3)(C) requires the non-moving party to file a separate statement of additional facts. *See Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015).

Local Rule 56.1 statements and responses should identify the relevant admissible evidence supporting the material facts – not make factual or legal arguments. *See Zimmerman v. Doran,* 807 F.3d 178, 180 (7th Cir. 2015). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Curtis*, 807 F.3d at 218 (quoting *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009)). The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere,* 791 F.3d 764, 767 (7th Cir. 2015).

## II.    Analysis

Plaintiffs have alleged negligence and loss of consortium damages. Under Illinois law, to succeed on a negligence claim, a plaintiff must prove that the defendant owed a duty to the plaintiff, breached that duty, and the breach was the proximate cause of the plaintiff's injuries. *Piotrowski v. Menard, Inc.*, 842 F.3d 1035, 1038 (7th Cir. 2016) (citing *Newsom–Bogan v. Wendy's Old Fashioned Hamburgers of N.Y., Inc.*, 953 N.E.2d 427, 431 (Ill. App. Ct. 2011). "Whether a duty is owed presents a question of law, while breach of duty and proximate cause present questions of fact." *Swearingen v. Momentive Specialty Chemicals, Inc.*, 662 F.3d 969, 972 (7th Cir. 2011) (citing *Thompson v. Gordon,* 948 N.E.2d 39, 45 (Ill. 2011). Duty and

liability are distinct concepts that must be separately considered, and where there is no duty owed, no liability can exist. *Swearingen*, 662 F.3d at 972 (citations omitted).

Orbis argues that it is entitled to summary judgment because (1) Orbis did not owe Kucharski a duty, and (2) Orbis's alleged breach was not the proximate cause of Kucharski's injuries.

## A. Orbis's Duty of Care

### 1. The *Savage* Rule

Orbis first argues that it did not owe Kucharski a duty of care because the FMCSR imposes a non-delegable duty on carriers and drivers, like Polmax, not on shippers, like Orbis. The FMSCR provides: "A driver may not operate a commercial motor vehicle and a motor carrier may not require or permit a driver to operate a commercial motor vehicle unless [t]he commercial motor vehicle's cargo is properly distributed and adequately secured. . ." 49 C.F.R. § 392(a). Orbis requests that this Court apply the *Savage* rule, which the Fourth Circuit established to govern the duties of shippers and common carriers:

> The primary duty as to the safe loading of property is therefore upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

*United States v. Savage Truck Line, Inc.,* 209 F.2d 442, 445 (4th Cir. 1953). Put differently, the *Savage* rule, in concert with the FMCSR, "imposes liability on carriers even if shippers negligently load the cargo, except where the shippers' negligence was undiscoverable through reasonable safety inspection." *Vargo-Schaper v. Weyerhaeuser Co.*, 619 F.3d 845, 848–49 (8th Cir. 2010) (citations omitted). Based on the *Savage* rule, Orbis argues that it only had a responsibility to prevent latent defects to the load, but had no duty to correct open and obvious

defects. According to Orbis, there were no latent defects in the securement of the load, and accordingly, Orbis did not owe any duty to Kucharski. Plaintiffs respond that, while other jurisdictions do apply the *Savage* rule, Illinois courts have not adopted or applied the *Savage* rule. Accordingly, Plaintiffs argue that the *Savage* rule does not govern this case, and that Orbis owed Kucharski a common law duty to use ordinary care. Further, Plaintiffs contend that because Illinois is a comparative negligence state, Orbis should be held liable to Kucharski because it was one of the parties that proximately caused Kucharski's injury.

Although neither party cited to any Illinois cases adopting or rejecting the *Savage* rule, the Seventh Circuit has in fact applied the *Savage* rule in a shipper-carrier liability case.[1] In *Armour Research Found. of Ill. Inst. of Tech. v. Chicago, R. I. & P. R. Co.*, 297 F.2d 176, 178– 79 (7th Cir. 1961), a shipper brought an action against a railroad carrier for damages to equipment during shipment. The Seventh Circuit, in analyzing the plaintiff shipper's burden of proof, explained, citing *Savage*, that "when the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects in loading which are latent and concealed, and which cannot be discovered by ordinary observation on the part of the carrier. *Id.*

In a slightly different context, in *People of State of Ill. ex rel. Ill. Dep't of Transp. v. Medlin*, No. 93 C 4190, 1995 WL 5875 (N.D. Ill. Jan. 4, 1995), an Illinois court considered whether a shipper-loader could be held liable for injuries to a third-party—in this case, the Illinois Department of Transportation—which owned a bridge that was damaged due to the

---

[1] The Court did not identify any other Illinois federal courts that have cited *Savage*. The Court identified one Illinois state court case citing *Savage*. In that case, *Mirski v. Chesapeake & O. Ry. Co.*, 194 N.E.2d 361, 364 (Ill. App. Ct. 1963), *rev'd on other grounds*, 202 N.E.2d 22 (Ill. 1964), an Illinois appellate court cited *Savage* for the proposition that a "carrier is liable as an insurer, without proof of negligence, unless the carrier prove one of the exceptions to absolute liability listed above, such as damage due to acts of God, the nature of the goods, etc."

height of the load on a flatbed truck. The court, citing *Savage* and *Armour*, noted that in shipper-carrier lawsuits relating to damaged goods or equipment, "when the shipper assumes responsibility for loading the goods, the general rule is that the carrier is still liable for the loss or injury to goods resulting from defects in loading that are discoverable by ordinary inspection by the carrier." *Id.* at *2. The court explained, however, that shipper-carrier liability for a third-party claim was a question of first impression in the Seventh Circuit, but explicitly decided, as courts in other districts had done, to adopt the *Savage* rule that shipper-loaders are "liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper." *Id.* at *2-3 (citing *S. Pac. Transp. Co. v. United States,* 456 F. Supp. 931 (E.D. Cal. 1978). The court thus found, based on the *Savage* rule, that summary judgment as to the shipper was "inappropriate if there is a genuine issue of fact whether any defects in the load were concealed by [the shipper] and were a proximate cause of [the crash]." *Id.* at *3. Since the shipper had not concealed the height of load, the court found that it could not be held liable for the damage. *Id.*

Given that the Seventh Circuit has adopted the *Savage* rule, *Savage* applies here. Moreover, courts in several other jurisdictions have either explicitly applied the *Savage* rule or utilized rationale embodied in the *Savage* rule.[2] Applying the *Savage* rule to this case, Orbis

---

[2] *See, e.g.*, *Vargo–Schaper*, 619 F.3d at 848–49 (following the *Savage* rule); *Spence v. ESAB Grp., Inc.,* 623 F.3d 212, 220 (3d Cir. 2010) (same); *Rector v. Gen. Motors Corp.,* 963 F.2d 144, 146–47 (6th Cir. 1992) (holding that carriers, not shippers, normally have the responsibility to load cargo in a safe manner); *Ala. & V. Ry. Co. v. Am. Cotton Oil Co.,* 249 F. 308, 311 (5th Cir. 1918) (using the same rationale later adopted by the *Savage* court); *Whiteside v. United States*, No. 1:11-CV-154, 2013 WL 2355522, at *6 (E.D. Tex. May 28, 2013) (relying on *Savage* rule); *Morris v. Ford Motor Co.,* No. 2:10cv504, 2012 WL 5947753, at *12–13 (N.D. Ind. Nov. 28, 2012) (adopting *Savage* rule); *Ebasco Servs., Inc. v. Pac. Intermountain Express Co.*, 398 F.Supp. 565, 568 (S.D.N.Y. 1975) (relying on

may be held liable for injuries caused by its negligence if it concealed any defects in the load, or put differently, if Orbis's alleged defective or unsafe loading was not evident upon reasonable inspection. *Medlin*, 1995 WL 5875, at *3.

### 2. Latent or Concealed Defect

Under Illinois law, a latent defect is "a defect that is hidden and not readily observable or discoverable to any but the most searching examination." *Henderson Square Condo. Ass'n v. LAB Townhomes, L.L.C.*, 16 N.E.3d 197, 216 (Ill. App. Ct. 2014), *aff'd sub nom.* 46 N.E.3d 706 *opinion modified on denial of reh'g* (Jan. 28, 2016); *see also Petersen v. Hubschman Construction Co.*, 389 N.E.2d 1154 (1979) (latent defect is one that is not readily discoverable through reasonable and diligent inspection). Courts analyzing whether a defect is latent in shipper-carrier liability cases have considered the driver's level of experience, reasoning that "drivers with more experience are more capable of detecting loading defects." *Vargo-Schaper*, 619 F.3d at 849; *see also White v. Dietrich Metal Framing,* No. 1:06-CV-554, 2007 WL 7049797, at *7 (E.D. Tex. July 5, 2007) ("the latent or patent nature of such defect may depend in some measure upon the experience of the observer") (quotations and citation omitted). Courts have also considered whether the shipper-loader provided any assurances regarding the safety of the load to the driver-carrier, reasoning that such assurances increase the likelihood that the defect was concealed. *See, e.g.*, *Franklin Stainless Corp. v. Marlo Transp. Corp.,* 748 F.2d 865, 870 (4th Cir. 1984). Finally, courts also look to whether the carrier had an opportunity to view and inspect the load. *Aragon v. Wal-Mart Stores E., LP*, 735 F.3d 807, 810-11 (8th Cir. 2013)

---

*Savage*); *Decker v. New England Pub. Warehouse, Inc.*, 749 A.2d 762, 766 (Me. 2000) ("The policy behind the *Savage* rule is well founded.").

Courts applying these rules have thus upheld negligence claims against shippers in cases where the shipper assured the driver of the safety of the load or where the driver did not have sufficient experience or opportunity to recognize that the load was not safe. In *Franklin*, 748 F.2d at 865-66, for example, the district court held the carrier completely liable for injuries caused by the loading of steel coils in the center of a trailer without the use of bracing to secure them because the shipper's loading defect was open and obvious. The Fourth Circuit held that although the manner in which the coils were loaded in the trailer was apparent to the carrier, the defect in the loading was not necessarily patent because the driver of the truck had informed the shipper that he had never hauled steel coils before, the driver had inquired as to whether the load was secure and was assured by the shipper that it was, and the shipper's traffic manager had assured the driver that the method of loading was safe. *Id.* at 868–69. The court thus concluded that the carrier's reasonable reliance on the shipper's assurances of safety and lack of specific knowledge of the defect precluded a finding that the defect was open and obvious, and thus, held that the shipper could be held liable. *Id.* at 869.

Similarly, in *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 215 (3d Cir. 2010), the district court granted summary judgment in favor of a shipper under the *Savage* rule that shippers can only face liability for latent defects. The Third Circuit overturned the district court's decision and held that the shipper could not be absolved of liability at the summary judgment stage because the record contained evidence that the shipper loaded the cargo, applied securement devices, and importantly, expressed assurances that its manner of securing the load was adequate, and thus, a jury could find that the shipper breached its duty of care. *Id.* at 222. *See also Grantham v. Nucor Corp.,* No. 2:07–CV–229, 2008 WL 3925211, at *3 (D. Utah Aug. 20, 2008) (genuine issue of fact existed as to whether defect in loading was latent where driver

lacked experience and shipper assured the driver, in response to concerns about load's safety, that he was experienced and knew what he was doing); *Syngenta Crop Prod., Inc. v. Doyle Brant, Inc.*, No. 3:06–CV–84–S, 2008 WL 167293, at *3 (W.D. Ky. Jan. 16, 2008) (court could not conclude driver did not rely on shipper's assurances that load was secure and thus issue of fact existed as to whether defect in the shipper's loading of trailer was apparent).

In contrast, in cases where the carrier-driver had sufficient experience, where the defect in loading was open and obvious, and where there was no evidence that the shipper made any assurances about the safety of the load, courts consistently hold that shippers cannot be held liable for negligent securement of cargo. In *Aragon*, 735 F.3d at 810-11, for example, the Eighth Circuit held that a shipper could not be held liable for damages in a case where the cargo was shrink-wrapped but not secured by load locks because "no reasonable jury could have found that the absence of securing devices was anything other than open and obvious to [the carrier]." *Id.* at 810. The court reasoned that while the obvious absence of a "particular method of securing a load, does not necessarily compel a conclusion that the risk created by the missing securement device is patent . . . a nonmovant must present evidence that creates a triable question of fact." *Id.* The court found that the carrier-driver failed to present sufficient evidence to create an issue of fact as to whether the securement defect was latent. *Id.* The court distinguished the case from *Franklin*, explaining that in this case, the carrier had an opportunity to view and inspect the load, he was aware that the load was shrink-wrapped and not secured by load locks, he never expressed reservations about his inexperience or inquired as to whether the load was secure, and the shipper never provided assurances that the method of loading it employed was safe. *Id.* at 811. Under these facts, the court held that the carrier-driver had "not offered sufficient evidence in support of his assertions that the visible absence of straps was latent or that he received

assurance that the pallets were loaded and secured properly." *Id*. Accordingly, the court upheld summary judgment in favor of the shipper. *Id*.

In a case much like this one, *Hardesty v. American Seating Co.,* 194 F. Supp. 2d 447, 449 (D. Md. 2002), the court addressed a driver's negligence claim against a shipper for injuries he suffered when cargo loaded by the shipper fell on him after arriving at his destination and opening the trailer doors. In that case, the shipper loaded the cargo and installed load bars in the trailer, and the driver examined the securement devices both from the ground level and from the rear of the trailer. *Id*. The driver had the opportunity to observe the cargo during loading but failed to do so. *Id*. The court granted summary judgment for the shipper explaining that the FMSCR required the driver to secure the load and he failed to do so because he did not observe the loading, failed to examine the load bars sufficiently, and opened the rear trailer doors in an unsafe manner. *Id*. at 451.

Similarly, in *Morris v. Ford Motor Co.*, No. 2:10CV504, 2012 WL 5947753, at *10–11 (N.D. Ind. Nov. 28, 2012), the court granted summary judgment in favor of the shipper in relation to damages caused by unsecured cargo because the carrier-driver had multiple opportunities to inspect the cargo after it was loaded and failed to raise any concerns about the safety of the load. *Id*. The court reasoned that any securement defect easily could have been observed, and the carrier-driver had the responsibility under the FMCSR to ensure the load was safely secured. The court explained that if the driver "believed that straps were needed to properly secure the load it was his duty to note that and request that the straps be secured." *Id*. *See also Vargo-Schaper*, 619 F.3d at 850 (upholding summary judgment in favor of shipper because there was no evidence that shipper provided assurances regarding safety of load, driver was experienced, and spotter for carrier inspected each load to make sure it was loaded safely,

thus any loading defect was observable); *Smith v. N. Dewatering, Inc.*, No. CIV. 01-1948

JNERLE, 2004 WL 326696, at *3 (D. Minn. Feb. 19, 2004) (granting summary judgment in

favor of shipper because the carrier-driver was experienced, the "failure to use stakes [to secure

the load] was readily discernable from [his] ordinary observation," and the driver did not rely on

any assurances from the shipper).

Viewing the evidence in the light most favorable to Plaintiffs and applying *Savage*,

Plaintiffs have failed to identify any evidence in this case that any alleged defect in the

securement of the cargo was latent or concealed. First, it is uncontested that the carrier's driver

in this case, Adam Gadek, was an extremely experienced truck driver who had operated

commercial motor vehicles for over thirty years. (Dep. of Adam Gadek, 8: 9-12.) Gadek had a

Commercial Driver's License and had familiarized himself with the FMCSR as part of his

employment with Polmax. (*Id*. 14: 14-17, 54: 3-14.) The record is devoid of any evidence that

Gadek expressed any concerns about his experience level or the security or stability of the cargo,

and in fact, Gadek testified that the driver is "supposed to secure the freight" so it does not fall

inside the truck. (*Id*. 32: 16-18.) In short, Gadek was experienced enough to recognize any

defects in the load and he knew he had the responsibility to do so.

Second, Plaintiffs have failed to identify any evidence that Orbis made any assurances to

Gadek regarding the stability of the load. Oscar Lopez, the Orbis employee in charge of loading,

did not recall having any specific conversations with Gadek, but he testified that it was his

practice to tell drivers to inspect their own load and put locks on it if necessary. (Dep. of Oscar

Lopez, 40: 4-14.) Plaintiffs, unable to produce any evidence that Orbis assured Gadek that the

load was safe, ask the Court to assume that Orbis gave such an assurance based on Gadek's

testimony that he often asks the shipper if the load was safe. (Pl.'s Resp. to Mot. for Summ. J.

11.)  This argument, however, is unpersuasive and does not raise an issue of fact, especially since Gadek admitted that he did not recall any details relating to this load.  (Dep. of Adam Gadek, 33: 8-13.)

Lastly, viewing the evidence in the light most favorable to the Plaintiffs, Gadek had several opportunities to observe the load and any defects in the securement of the load.  Drivers are permitted to stand near the shipping desk, which is about fifty feet away from the loading dock, and watch their trailers being loaded.  (Dep. of Thomas Young 20, 46.)  Once the cargo is loaded, drivers are permitted to approach the rear of the trailer and affix securement devices such as load locks, straps, or bars.  (*Id*. 46-47.)  Additionally, after the trailer is loaded and the driver pulls away from the loading dock, drivers typically walk around to the back of the vehicle and close the rear doors before the shipper seals the doors shut. (Kucharski's Statement of Facts, 9, ¶ 14.)  Gadek admitted that when closing the doors, drivers are able to view the load from the ground level, the same way that the driver was able to examine the load in *Hardesty*.  (Dep. of Adam Gadek 42: 3.)  Additionally, approximately thirty inches existed between the end of the load and the rear doors of the trailer, so Gadek could have easily climbed into the trailer to further inspect the load if he felt that was necessary.  (Kucharski's Statement of Facts, 3, ¶ 11.)  One of Plaintiffs' primary contentions is that Orbis should have shrink-wrapped the load at issue to ensure its stability.  Regardless of whether that is true, the evidence shows that Gadek had multiple opportunities to inspect the load and could easily have observed any defects in the securement of the load, including that the load was not shrink-wrapped.

In sum, the facts here are similar to those in the line of cases—like *Aragon*, *Hardesty*, and *Morris*—finding that a shipper could not be held liable than to the facts in the cases finding that a shipper could be held liable.  Unlike in *Franklin*, where the driver told the shipper he was

inexperienced and the shipper assured the driver, after an inquiry, that the load was secure, here, the driver was very experienced, and there is no evidence that the driver made any inquiry about the security of the load or that the shipper offered any assurances. Here, like in *Aragon*, the driver-carrier had an opportunity to inspect the load, inspection would have easily revealed the method through which the load was secured, the driver never expressed reservations about the security of the load, and the shipper never made any assurances about the load. Like in *Hardesty*, the driver had the opportunity to inspect the cargo from the ground level and the rear of the trailer, and as the court explained in that case, viewing the cargo from this vantage point would allow the driver to examine and assess the quality of the securement method.

Given these facts "no reasonable jury could have found that the absence of securing devices was anything other than open and obvious" to the carrier-driver, Gadek. *Aragon* 735 F.3d at 810. Similar to *Aragon*, the non-movant Plaintiffs must at least "present evidence that creates a triable question of fact" on the issue of whether the alleged loading defect was latent, and as discussed above, Plaintiffs have not designated specific facts—and it is not the Court's responsibility to locate such facts in the record—to create a triable controversy or support his "assertions that the visible absence of [shrink-wrap] was latent." *Id. See also Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 711 (7th Cir. 2015) ("We are not required to scour through hundreds of pages of deposition transcript[s] in order to verify an assortment of facts").

Accordingly, the Court grants Defendant Orbis's motion for summary judgment.[3]

---

[3] Orbis also argues that its conduct was not the proximate cause of Kucharski's injuries, however, the Court need not address this argument since it has granted Orbis's motion for summary judgment on other grounds.

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Orbis's motion to bar the testimony of Donald Hess.  The Court grants Orbis's motion for summary judgment.

**DATED:** May 5, 2017                                  **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge